UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NO. 05-130 |
| CHERLYN ARMSTRONG SCHERER PREJEAN, ET AL | * | SECTION "L" |

**ORDER & REASONS**

Before the Court is the Defendants' Joint Motion for Release and Exemption of Assets from Forfeiture to Pay Attorneys' Fees, Defense Costs, and Living Expenses.[1]  An adversarial evidentiary hearing was held on July 18, 2005 to address the issue of release and exemption of Defendants' assets from forfeiture.[2]  For the following reasons, the Motion is hereby GRANTED IN PART.

**I.  Factual and Procedural Background**

The Court's Order and Reasons of July 8, 2005 recites in greater detail the factual and procedural background of the case.  Briefly, this case concerns an alleged conspiracy involving Cherlyn Armstrong Scherer Prejean ("Ms. Prejean"), the owner of three pain management clinics and two pharmacies in the New Orleans area.  Made defendants are Ms. Prejean, the various clinics and pharmacies, and three physicians who were employed at the clinics.  The government alleges that the Defendants conspired to distribute and dispense prescription pain medication

---

[1]     This motion is only brought by Ms. Prejean and the corporate Defendants.  Drs. DeLoach, Guenther, and Cullins have not joined in the motion.

[2]     See the Court's Order and Reasons of July 8, 2005, granting the adversarial hearing.

without medical necessity and outside the scope of professional practice.  All Defendants have been arraigned, have pled not guilty, and have been released on bond.

On April 12, 2005, pursuant to warrants issued by the DEA, the government seized the Defendants' bank accounts, vehicles, cash, and other assets, and placed notices of lis pendens on eleven parcels of Defendants' property.  Defendants filed the instant motion seeking release of all or a portion of the seized funds, and alleged that they have no assets other than those seized with which to pay the counsel of their choice and their necessary living expenses.  On July 8, 2005, this Court ruled that due process required an evidentiary hearing to determine whether some or all of the Defendants' assets were seized without probable cause.

## II.  Defendants' Joint Motion for Release and Exemption of Assets from Forfeiture to Pay Attorneys' Fees, Defense Costs, and Living Expenses

### A.        Grounds for Forfeiture Hearing

21 U.S.C. § 853(a) provides that a person convicted of a federal drug crime shall forfeit any and all property obtained directly or indirectly from criminal activities, and all property used to facilitate criminal activities.  The U.S. Supreme Court has held that this provision "is plain and unambiguous: all assets falling within its scope are to be forfeited upon conviction, with no exception existing for the assets used to pay attorney's fees – or anything else, for that matter." *U.S. v. Monsanto*, 491 U.S. 600, 607 (1989).  Despite the broad language of the statute, the majority of the circuits addressing the issue have determined that, if certain conditions are met, due process requires a district court to hold a pre-trial, post-forfeiture hearing to determine whether probable cause exists to indicate that the assets seized are traceable to the underlying offense.  *U.S. v. Jones*, 160 F.3d 641, 643 (10th Cir. 1998); *U.S. v. Moya-Gomez,* 860 F.2d 706,

729-30 (7th Cir. 1988); *U.S. v. Harvey*, 814 F.2d 905, 928-29 (4th Cir. 1987) *superseded on other grounds by In re Forfeiture Hearing as to Caplin & Drysdale, Chartered,* 837 F.2d 637 (4th Cir. 1988), *aff'd* 491 U.S. 617 (1989).  *Contra U.S. v. Bissell*, 866 F.2d 1343, 1354 (11th Cir. 1989) (holding no post-restraint hearing is necessary because the trial itself satisfies due process).  *See also U.S. v. Melrose East Subdivision*, 357 F.3d 493, 499-500 (5th Cir. 2004) (citing *U.S. v. Jones* with approval in a civil forfeiture case); *U.S. v. Causey*, 309 F. Supp. 2d 917, 926-27 (S.D. Tex. 2004) (using the *Jones* test to determine whether a pre-trial hearing regarding forfeiture was appropriate).

Generally, to receive a pre-trial, post-forfeiture hearing, the defendant must make two showings – first, a showing that he or she has no other assets, other than those seized, with which to pay counsel and/or living expenses, and, second, a prima facie showing that there is a bona fide reason to believe the grand jury erred in finding that the assets seized are traceable to the drug offense.  *Jones*, 161 F.3d at 647.   Under the first showing, the defendant has the burden of persuasion, and, under the second, the defendant has the burden of production.  *Id.*  If the defendant makes the necessary showings, the district court holds an adversary hearing.  *Id.*  On July 8, 2005, this Court held, following the two-part test articulated in *Jones*,  that a pre-trial, post-forfeiture hearing should be held in this case to satisfy due process.  The hearing was set for July 18, 2005.

**B.     Burden of Proof at the Hearing**

On July 15, 2005, Defendants submitted a Joint Memorandum to Address Factual, Procedural, and Legal Issues in Advance of the Adversary Hearing.  The government filed a response to Defendants' Memorandum.  In the Memorandum, Defendants argued that the initial

burden of proof at the hearing should be upon the government to "establish probable cause to believe that the restrained assets are traceable to the underlying offense." *Jones*, 161 F.3d at 647.  However, the government argued that the burden of proof should be upon the Defendants "to prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that [they need] those same assets to hire counsel." *U.S. v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001).  *See also U.S. v. Wingerter,* 369 F.Supp.2d 799, 808 (E.D.Va. 2005) (following *Farmer* in a criminal forfeiture case).

As in any case involving the deprivation of an individual's private property, the government must demonstrate that it has a legitimate reason for doing so.  In cases involving criminal drug forfeiture under 21 U.S.C. § 853(a), the government must demonstrate probable cause to believe the assets which were seized are traceable to illegal drug transactions.  *Jones*, 161 F.3d at 647.  However, at the pre-trial stage, the government has already demonstrated probable cause to the grand jury, and the grand jury has indicted the defendants and ordered seizure of assets based upon the government's showing of probable cause.  The grand jury's findings are not to be disturbed at the pre-trial stage, and the district court must take all allegations in the indictment as true.  *Id.* at 648.  At the hearing, the government may rely on the grand jury's indictment because an "indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more." *Id.* (citing *Costello v. U.S.*, 350 U.S. 359, 363-64 (1956)).

Thus, Defendants are correct that the government bears the initial burden to demonstrate that probable cause exists that the assets seized are traceable to the charged drug offense. However, the government can meet this initial burden by relying on the indictment and

evidentiary affidavit submitted.  *U.S. v. Wittig*, 333 F. Supp. 2d 1048, 1051 n.3 (D. Kan. 2004).

The government is not required to submit new evidence.  The Fifth Circuit has implicitly

endorsed this approach in *Melrose East*:

> Although the government bears the burden at a pretrial hearing of
> persuading the court that probable cause exists, we agree with the
> government that the district court generally should not permit a
> person in [the defendant's] position to examine the government's
> witnesses without first producing some evidence suggesting that
> the restrained assets were untainted.

*U.S. v. Melrose East Subdivision*, 357 F.3d 493, 507 n.17 (5th Cir. 2004).

Once the government introduces its evidence (the indictment and any other supporting

materials), the burden shifts to Defendants to establish by a preponderance of the evidence that

they need the seized assets to pay counsel, and that the grand jury erred in determining that all of

the restrained assets are traceable to the offense.  *Farmer*, 274 F.3d at 805.  These two showings

are similar in substance to the showings required by *Jones* to obtain a pre-trial adversary hearing.

*See Jones*, 161 F.3d at 647-48.

However, the burden of proof is somewhat different at the hearing stage as to the second

element of the *Jones* inquiry.  To obtain a pre-trial adversary hearing, Defendants only had to

demonstrate that there was a bona fide reason to believe the grand jury erred in seizing all of

their assets;  the Defendants only carried a burden of production on this element.  *Jones*, 161

F.3d at 647-48.  At the hearing stage, Defendants must prove both elements  – the need for funds

and the error of the grand jury in determining all assets are traceable to the offense – by a

preponderance of the evidence.  *Farmer*, 274 F.3d at 805.

**(1)  The Government's Evidence**

The government carried the initial burden at the hearing to establish that there was

probable cause to believe that Defendants' assets were traceable to their alleged drug offenses. At the hearing, the government submitted several exhibits into evidence. The Court summarizes these exhibits under the assumption, required by *Jones*, that all allegations in the indictment are true and that the underlying offense has been committed. *Jones*, 161 F.3d at 647-48.

### a.  The Lejarza Affidavit

First, the government submitted the Affidavit of Louis A. Lejarza in Support of Search Warrants, Criminal Complaints, and Seizure Warrants (the "Lejarza Affidavit"), presently filed in this matter under seal.[3]  The Lejarza Affidavit was originally filed in April 2005 in support of the indictments, search warrants, and seizures of the property of Defendants. The Lejarza Affidavit summarizes evidence obtained by the DEA tending to show probable cause to believe that the Defendants committed underlying drug offenses.

In particular, the Lejarza Affidavit relies upon several key pieces of evidence.  First, Ms. Prejean entered into a Consent Agreement with the Louisiana Board of Nursing on November 19, 2004.  In this Agreement, Ms. Prejean admits that she violated the Louisiana Nurse Practice Act in the years 1998, late 2001, and early 2002.  Ms. Prejean admits that she failed to ensure patient safety during those periods by 1) failing to ensure that patients did not return more often than recommended, 2) failing to allot adequate time to physicians to evaluate patients properly, and 3) failing to obtain proper permits and maintain proper inventory records on controlled substances at the clinics, among other actions.

In addition, the Lejarza Affidavit recounts several law enforcement investigations into

_____

[3]  The government has filed a redacted version of the Lejarza Affidavit.  The following description contains no information that is presently under seal.

Ms. Prejean and the Defendant clinics.  A DEA investigation from 1997 to 2000 revealed that

Ms. Prejean had fraudulently assigned DEA registration numbers to several medical interns who

could not be licensed to dispense controlled substances.  In addition, employees interviewed

during that period stated that Ms. Prejean encouraged physicians to write prescriptions without

medical necessity.  Further, the clinics at that time were dispensing controlled substances, and

thus were acting as an unlicensed pharmacy or physician's dispensary.  DEA informants during

that period also recounted that they received prescriptions without medical need and without

evidence of injury.

In 2003, the FBI and Slidell Police Department investigated Defendants.  Several patients

and confidential informants described the business practices of the clinics at that time.  The

clinics operated on a cash-only basis.  In March 2003, approximately thirty patients were

arrested near the Slidell clinic for a variety of Louisiana pharmaceutical narcotics violations.

In December 2004, the DEA developed a confidential source who had been a patient at

the Defendant clinics since 2001.  The confidential source made numerous undercover purchases

at the clinics between November 2004 and March 2005.  These purchases were generally

"overlapping" purchases, meaning that the confidential source obtained prescriptions from the

clinics more often than the 14-day period mandated by the prescription.  The confidential source

documented repeat visits to the same physicians, in some cases within two days of each other;

extremely brief examinations by physicians, in several instances less than 30 seconds; and the

clinics' failure during 2004 and 2005 to secure a recent MRI or other objective documentation of

the confidential source's injury.  During the same period from January to March 2005, the DEA

sent an undercover agent to enroll as a new patient at the clinics.  The agent presented an MRI

which showed no medical abnormalities; however, the agent routinely received prescriptions for

pain medication from doctors at the clinics, sometimes without physical examinations.

Importantly, the Lejarza Affidavit also makes detailed findings linking each asset seized

to the criminal activity of Defendants.  For example, the residence of Ms. Prejean was the

business address of many of the corporate Defendants.  The bank accounts seized had been used

for daily deposits from the various businesses.

### b.  Clesi Affidavit I (undated, July 2005)

At the hearing, the government also submitted the Affidavit of Alan J. Clesi, Diversion

Investigator for the DEA ("Clesi Affidavit I").  This affidavit was discussed in the Court's July

8, 2005 Order and Reasons.  In the affidavit, Mr. Clesi recounts his investigation of the eight

patient declarations submitted by Defendants in support of the present motion.   The

investigation allegedly revealed overlapping prescriptions for several of the declarants.

### c.  The Guenther Affidavit

The government submitted the Affidavit of Dr. Joseph F. Guenther (the "Guenther

Affidavit"), a defendant who did not join in the present motion.  Dr. Guenther was employed by

the clinics from March 2002 to April 2005.  In his affidavit, Dr. Guenther admits that, during his

tenure at the clinics, he and the clinics failed to follow the regulations of the Louisiana State

Board of Medical Examiners for pain management.  Dr. Guenther alleges that he prescribed

medications to patients with fake or missing MRIs, with knowledge of the clinic staff and

owners.  Dr. Guenther further states that he issued overlapping prescriptions with knowledge of

the clinic staff and owners.

### d.  The Robinson Affidavit

Fabian Robinson, R.Ph., also provided an affidavit for the government (the "Robinson Affidavit").  Mr. Robinson was the first pharmacist in charge of Defendant Mia's Metairie Pharmacy, and was employed by the pharmacy from August 2003 to March 2004.  He states that he accepted the position with the understanding that the pharmacy would be full-service; however, the pharmacy quickly began dispensing only Hydrocodone, Alprazolam, and Carisoprodol, the three drugs  prescribed by the clinics.  Mr. Robinson further alleges that the volume and type of prescriptions he filled would normally have alerted him to question the prescriptions, but he did not do so during the period of his employment at Mia's Pharmacy.

### e.  The Whitfield Affidavit

In her affidavit (the "Whitfield Affidavit"), Special Agent Trevia Whitfield analyzed the sign-in sheets, accounting records, and payroll records for all three of the clinics for a recent two-week period, January 17 to 29, 2005.  The Whitfield Affidavit purports to measure rates of patient and treatment volume at the clinics.  Among other findings, the Whitfield Affidavit found that the clinics saw 3,250 patients over the two weeks studied, with a total average of 2 minutes and 50 seconds spent by the doctor per patient.

### f.  The Parr Affidavit

The government also submitted the affidavit of Dr. Alan T. Parr (the "Parr Affidavit").  Dr. Parr is a pain management doctor who practices in the New Orleans metropolitan area.  The affidavit offers an expert opinion regarding patient treatment and volume based upon the evidence gathered by Trevia Whitfield.  Dr. Parr concludes, based on his knowledge of the standard of care in the community of pain management, that issuing prescriptions in under three

minutes did not fall within the usual course of professional practice in the region.

### g. Clesi Affidavit II (July 17, 2005)

The government submitted a supplement to the Affidavit of Alan J. Clesi, Diversion Investigator for the DEA.  The second affidavit ("Clesi Affidavit II") recounts Mr. Clesi's further investigation of declarant Jo Shewmake.  According to Mr. Clesi's investigation, Ms. Shewmake was not forthcoming in her declaration because she failed to report that she received the same pain medication from another physician during her treatment at the Defendant clinics.

### h. The Zechenelly Affidavit

Stacy Zechenelly, a financial analyst for the FBI, also submitted an affidavit for the government (the "Zechenelly Affidavit").  Ms. Zechenelly reports that her analysis of the financial records of Defendants reveals that the funds seized were accumulated after November 2003.  In addition, clinic personnel have been unable to account for $521,096 in missing cash deposits from 2004 from the clinics.

### (2)  Defendants' Evidence

To rebut the government's showing, Defendants presented a number of witnesses. Again, the Court summarizes this testimony under the required assumption that the underlying offense has been committed.

### a. Rhonda Bonds, R.N.

Rhonda Seymour Bonds, registered nurse, was employed by Defendants from December 2004 to April 2005 (she also worked as a temporary employee at the clinics from June to December 2004).  Ms. Bonds worked at all three clinics during her employment.  While at the clinics, Ms. Bonds performed patient intake, and eventually was promoted to assistant director of

nursing, in which position she was responsible for equipment purchasing and design of patient intake forms.

Ms. Bonds explained the screening process at the three clinics.  According to Ms. Bonds, patients would present photographic identification and any recent MRI or diagnostic test to the receptionist.  The receptionist would require the patient to sign consent forms regarding disclosure of medical information, medical history, risks of medication, and the clinics' rules and regulations.  Ms. Bonds testified that occasionally the clinics would turn away patients who had no identification.  After signing the consent forms, patients were initially evaluated by registered nurses or nursing assistants.  The nurse would take the patient's medical history, measure his or her vital signs (blood pressure, etc.), and perform an initial physical assessment.  Occasionally, a patient would then meet with an internist.  After meeting with the nurse, the patient was seen by the pain management specialist.

Ms. Bonds testified that the pain management specialists generally prescribed three drugs – a muscle relaxant (Carisoprodol, known as "Soma"), pain medication (Hydrocodone), and an anti-anxiety medication (Alprazolam, known as "Xanax").  Ms. Bonds testified that doctors would use pre-printed prescription forms, but would often make changes to the forms.   Ms. Bonds testified that the clinics' doctors also used pre-printed evaluation forms.  According to Ms. Bonds, the pre-printed prescriptions were a routine part of medical practice, and the forms were individualized depending upon the doctor's exam.  Ms. Bonds had no concerns that patients were returning too often to the clinics or were receiving multiple prescriptions.

On cross-examination, Ms. Bonds stated that she had only worked at the clinics full-time for three to four months.  The government introduced copies of the clinics' pre-printed

11

evaluation forms which included boilerplate diagnoses, for example, "Patient has good results and no side effects."  Ms. Bonds further explained that the clinics used pre-printed evaluation forms because the forms reflected common complaints and diagnoses.  Ms. Bonds pointed out that the forms contain blank spaces for modifications.  Ms. Bonds stated that she did not know who specifically prepared the forms.  Ms. Bonds also described the clinics' use of physical therapy as treatment.  According to Ms. Bonds, patients would receive physical therapy once every three months or as needed.  There was no licensed physical therapist on staff, and the therapy administered consisted of heat and ice packs and use of a therapy chair.  Ms. Bonds was unaware of any referrals made by physicians to outside providers of physical therapy.  She further testified that physical therapy was not indicated for chronic pain patients because these patients had not responded to that type of treatment.

Ms. Bonds further testified that she was unaware of any screening at the clinics for substance abuse problems.  She noted that such screening was within the doctor's responsibility. Ms. Bonds also described the system in place between the clinics to prevent duplicate patient files.  According to Ms. Bonds, there was no computer network between the clinics, and patients were advised that treatment at multiple clinics during the same period was against clinic rules. Thus, the responsibility was entirely upon the patient to prevent over-prescription.  Patients were also required to sign an agreement that they would not loiter near the premises after treatment. Ms. Bonds also stated that the statistics compiled by Trevia Whitfield were misleading, in that the time spent with the doctor was not inclusive of a patient's entire clinic visit.  Ms. Bonds did not find the brief time spent by the doctors per patient to be unusual.

### b.  Patients' testimony

Defendants offered the testimony of five former patients of the defendant clinics – Lois Plaisance, Mary Folse, Victoria DeSoto, Jo Schewmake, and Lisa Simmons.  All of these patients previously filed declarations in support of Defendants.

Lois Plaisance was a patient at the Slidell clinic from late 2002 to April 2005.  Ms. Plaisance testified that she began treatment at the clinic due to an injury to her lower back and right leg from a slip and fall off a ladder at her home.  Ms. Plaisance's treating physician, Dr. Purser, had recommended that she visit a pain clinic.  Ms. Plaisance described the screening process at the clinic on her visits.  Ms. Plaisance testified that she had to produce identification and a recent MRI on every visit, and that she met with a nurse prior to the doctor's visit.  Ms. Plaisance further stated that the prescriptions she received at the clinics were her only source of pain medication.  She stated that the pain medication relieved her pain, and that, since the closing of the clinics, she has received treatment from Dr. Purser.

Mary Folse was a patient at the Gretna clinic from 2001 to April 2005.  She visited the clinics on the recommendation of her friend, Victoria DeSoto, who was a patient of the clinics.  Ms. Folse testified that she suffers from bulging discs in her back due to a slip and fall twelve years ago at her job as a waitress.  Ms. Folse stated that the Gretna clinic required her to produce a CAT scan and MRI prior to treatment, and that she was screened by a nurse who took her vital signs.  She testified that she was prescribed three drugs, Hydrocodone, Soma, and Xanax, and that she took these drugs as prescribed.  Prior to treatment at the clinics, Ms. Folse received treatment at Charity Hospital, where she received only physical therapy, not medication.  Ms. Folse stated that she has been rejected for treatment by several doctors since the defendant

13

clinics closed, and that her present physicians do not prescribe enough pain medication to relieve her symptoms.

Victoria DeSoto was a patient at the clinics from August 2001 to April 2005.  Ms. DeSoto visited the clinics after a car accident which injured her back.  Ms. DeSoto also testified that she suffers from a range of physical problems, including old injuries to her neck, back, and rotator cuff, degenerative discs, muscular dystrophy, ovarian tumors, cancer, and lupus.  Ms. DeSoto did not visit other doctors prior to treatment at the defendant clinics.  She described the screening process at the clinics similarly to Ms. Plaisance and Ms. Folse.  Ms. DeSoto received the same prescription as Ms. Folse, and Ms. DeSoto would return every 14 days for a reevaluation and new prescription.  Ms. DeSoto was receiving anti-seizure medication from another physician at the same time as her treatment at the defendant clinics.  Ms. DeSoto testified that she has not visited other pain management specialists since the closing of the clinics because other doctors refused to treat her.  She has received pain medication from the physicians treating her for muscular dystrophy and lupus, but the dosages are 30% of what she received at the defendant clinics.

Jo Stuart Shewmake was a patient at the Metairie clinic from August 2003 to April 2005.  Although Ms. Shewmake has been treated by two physicians for arm and knee injuries, she visited the clinics on the recommendation of a neighbor.  Ms. Schewmake testified that she suffers from pain from several accidents in 2002.   Ms. Schewmake described a similar screening process to that described by the other patients – screening by a nurse, then an examination from a doctor prior to receiving a prescription.  Ms. Schewmake testified that she was aware that she was prohibited from receiving prescriptions from outside doctors; however, while she was

14

treated at the defendant clinics, she received prescriptions for pain medication from Doctors

Biondo, Campbell, and Krauss, all of whom did not work at the clinics.  Ms. Schewmake further

stated that she was currently taking the following medications – Nemanda, Lorcet 10, Levoxyl,

Serax, Seroquel, Wellbutrin, Doxapram, Fioricet, aspirin, and Neurontin.

Lisa Simmons was a patient at the clinics sporadically from 2000 to 2005 for lower back

pain arising from a slip and fall accident at work.  She described a similar screening process to

that of the other patients who testified.  Ms. Simmons stated that, during the years she was

treated at the clinics, she visited multiple clinics and received overlapping prescriptions.  She

testified that she was going through a difficult divorce and custody battle, and was under

pressure from her boyfriend to obtain pain medications for him.  She would receive the same

prescriptions as Ms. Folse and Ms. DeSoto – Lortab, Soma, and Xanax.  Ms. Simmons further

testified that she had a Louisiana state criminal record due to a conviction in 2001 for

prescription forgery.  She stated the conviction was unrelated to her visits at the defendant

clinics.  Ms. Simmons related that her prior declaration in this case was inaccurate due to her

failure to disclose this conviction and the overlapping prescriptions.  She further stated that no

one at the clinics was aware that she was receiving overlapping prescriptions.

### c.  Dr. David Rosenfeld

Dr. David Rosenfeld testified on behalf of Defendants as both a fact witness and expert

witness.  Dr. Rosenfeld has been practicing anesthesia and pain management since 1999.  From

May to September 2001, Dr. Rosenfeld was a freelance physician for all three of the defendant

clinics.

Dr. Rosenfeld defined chronic pain as pain extending for three months or more beyond an

15

initial injury, with unusual length and severity. The effects of chronic pain on the body include psychological strains like depression and anxiety. According to Dr. Rosenfeld, there are a variety of treatments for chronic pain – pharmaceuticals for pain, anxiety, muscle relaxation, convulsion, and nerve blockage, injections at the site of pain, stimulators and implanted narcotic pumps, psychotherapy, physical and occupational therapy, and surgery as a last resort. He further stated that the expense of non-pharmacological treatments was high, and that most people cannot afford these treatments without insurance. Dr. Rosenfeld opined that pharmacological treatment over an extended period of time was appropriate for patients who could not afford other treatments, or when non-pharmacological treatments fail. He believes that treatment for chronic pain with pharmaceuticals alone is within the scope of legitimate medical practice.

Dr. Rosenfeld further stated that sleep disorder, depression, and anxiety are all common side effects of chronic pain, and that medications like Soma and Xanax are appropriate treatment for those side effects. However, Dr. Rosenfeld stated that he prescribes those drugs infrequently because he dislikes them. In his own practice, he uses sustained release opiates, which are more expensive than the drugs prescribed at the defendant clinics.

Dr. Rosenfeld described how he conducts screening and physical examination prior to issuing prescriptions. He noted that pain is not measurable like other medical conditions, so physical exams and assessments of functional impairments are important. Dr. Rosenfeld stated that, in his practice, he conducts the same examination on subsequent visits as the initial visit. He further stated that the length of the examination was unrelated to the legitimacy of the prescription. Each patient should be individually assessed, and that assessment can be brief.

Dr. Rosenfeld opined that it was possible to be a chronic pain sufferer with an MRI

showing no abnormalities, given the weaknesses of MRI technology.  He further stated that in pain management there are always drug-seeking patients who will find ways to get around the system, and that approximately 10% of his initial patient visits are by drug-seekers.

Regarding his employment at the defendant clinics, Dr. Rosenfeld testified that the defendant clinics were typical of other pain clinics at which he has worked in the past.  He stated that Ms. Prejean did not pressure him to write particular prescriptions, and that, due to his hourly salary, he had no incentive to see as many patients as possible.  He confirmed the screening process described by the patients who testified.  Dr. Rosenfeld stated that he did not use pre-printed prescription forms, and that he was unfamiliar with the pre-printed evaluation forms used by the defendant clinics in later years.  Dr. Rosenfeld described a practice whereby nurses or front-office staff would handwrite their evaluations on his records prior to his examination; the nurses' evaluations included similar boilerplate language to the pre-printed forms.

Dr. Rosenfeld testified that he believed his practice at the defendant clinics was ethical. He noted that he was concerned about the possibility of multiple files for patients at the clinics, and had spoken with Ms. Prejean about implementing a software system that would link the three clinics.  However, this program was never implemented.  Dr. Rosenfeld stated that the drug he primarily prescribed at the clinics was Hydrocodone.  He pointed out that, although the drug was not indicated for long-term use, Hydrocodone is routinely prescribed that way.

Dr. Rosenfeld stated that, while at the defendant clinics, his examinations of patients lasted for roughly five to ten minutes each.  He stated that an examination of less than five minutes would be appropriate in a particular case; however, for him, it would be impossible to evaluate a patient properly in less than five minutes.

17

### e.  Accountant's testimony

Defendants also offered the testimony of Charles Hausknecht, a certified public accountant.  Mr. Hausknecht analyzed the patient databases of all three defendant clinics that were seized by the government and produced in discovery to Defendants.  Mr. Hausknecht identified three subsets of patients – patients with duplicate files at two clinics (1,389 patients total), patients with three or more files at the clinics (527 patients), and patients with one file at one clinic (6,394 patients).

Mr. Hausknecht then computed the revenue from all of the clinics from the years 2000 to 2004.  After determining the average net income of the clinics, Mr. Hausknecht used the patient subsets to allocate the clinics' revenue between legitimate and illegitimate transactions.  Legitimate transactions were defined as revenue generated from the "single file, single clinic" subset of patients (6,394 total); illegitimate transactions were defined as revenue generated from the two "multiple file" subsets of patients (1,916 total).  Mr. Hausknecht then determined that 76.943% of the clinics' revenue was legitimate, and that 23.057% of the clinics' revenue during this period derived from illegitimate transactions.  Mr. Hausknecht concluded that the legitimate revenue of the clinics for the years 2003 and 2004 was $3,695,316.  This is the amount that Defendants request this Court to release for attorneys' fees and living expenses.

## C.  Discussion

In its Order and Reasons of July 8, 2005, the Court determined that Defendants had established by a preponderance of the evidence that they have no assets, other than those seized, with which to pay counsel of their choice and living expenses.  The government seized virtually all of Defendants' real and movable property, including their cash and bank accounts.

Defendants have demonstrated a genuine need for funds.

Thus, the central issue to be decided at this stage is whether the government has continued to establish probable cause to believe that all assets seized were derived from, or were used to facilitate, illegal drug transactions.  *See Farmer,* 274 F.3d at 805;  *Jones,* 161 F.3d at 647-48.  If probable cause is lacking as to certain assets, release of funds to Defendants is appropriate.  In forfeiture cases, probable cause is defined as "a reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion."  *U.S. v. Musa*, 45 F.3d 922, 924 (5th Cir. 1995) (citing *U.S. v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir. 1980)); *U.S. v. One Afghan Urial Ovis Orientalis Blanfordi Fully Mounted Sheep*, 964 F.2d 474, 476 (5th Cir. 1992).

Because the Court must take all allegations of the government as true, the Court is persuaded that the government has established probable cause to believe that at least some of Defendants' assets are traceable to illegal drug transactions.  Defendants ran a cash-only business that involved extremely high patient volume, prescriptions of highly addictive drugs, and extremely brief examinations by licensed physicians.  Defendants have argued that prescriptions issued by physicians licensed by the DEA are presumptively legal; however, the government has overcome the presumption of legality at least as to some of the patients seen at the clinics.  In her affidavit, Trevia Whitfield states that a patient's average time with a physician during a visit at the clinics was 2 minutes and 50 seconds.  Dr. Alan Parr, in his affidavit for the government, and Dr. David Rosenfeld, testifying for Defendants, both agree that they could not reasonably evaluate a patient for chronic pain within 2 minutes and 50 seconds.  Dr. Parr concluded that this average evaluation time required a finding that the prescriptions were not

written within legitimate medical practice.

Moreover, Defendants' patient declarations and witnesses failed to support Defendants' argument that these patients received legitimate medical treatment at the clinics. Ms. Folse described an injury twelve years old. In addition, she stated that she has been unable to obtain pain medication of the same strength from other physicians; indeed, many physicians were unwilling to prescribe any pain medication to her. Ms. DeSoto, despite her many physical ailments, has only been able to obtain 30% of the pain medication she received at the defendant clinics from other physicians. Ms. Shumake and Ms. Simmons both admitted that their declarations to this Court in prior briefings were inaccurate, and that they sought and received overlapping prescriptions during their treatment at the defendant clinics.

In short, none of Defendants' patient witnesses were credible, with the possible exception of Lois Plaisance. Defendants suggest that these witnesses were a cross-section of the clinics' patients. If that is indeed the case, the patients' testimony tends to establish that the clinics reasonably should have implemented a screening procedure to ensure that doctors did not issue overlapping prescriptions. Their testimony also suggests that the clinics should have been screening to ensure that patients did not develop substance abuse problems from the high-dosage prescriptions they received.

Despite the weakness of Defendants' patient testimony, the testimony of Dr. David Rosenfeld challenges the government's showing of probable cause as to at least some of the prescriptions issued at the clinics. Dr. Rosenfeld testified that during his employment at the clinics for four months in 2001, he spent an average of five to ten minutes evaluating each patient. Dr. Rosenfeld further stated that he did not use the clinics' pre-printed boilerplate

evaluations and prescriptions, but instead gave individualized treatment based upon hands-on, physical examinations.  Dr. Rosenfeld further testified that the clinics' method of long-term treatment with pharmaceuticals alone was within the usual course of medical practice, particularly for low-income patients without health insurance.  The Court is persuaded that Defendants have demonstrated that it is more likely than not that revenues generated from Dr. Rosenfeld's prescriptions are not the product of illegal drug transactions.

However, Dr. Rosenfeld's testimony does not fundamentally undermine the government's  showing of probable cause.  Certainly Dr. Rosenfeld established that it is more likely than not that the prescriptions he issued were legitimate.  However, the Court cannot presume that every doctor employed at the clinics evaluated patients like Dr. Rosenfeld.  In fact, the government's evidence of the physicians' average time spent per patient (2 minutes 50 seconds) and the reports of the DEA's confidential source in 2004 and 2005 indicate that Dr. Rosenfeld was probably the exception rather than the rule.  The Court concludes that, with the exception of Dr. Rosenfeld's prescriptions, the government has demonstrated that there is probable cause to believe the assets seized were traceable to criminal drug activities.

### (1)  Facilitation property

The government advances the argument that, even if Defendants can show that it is more likely than not that some assets seized were untainted by illegal drug transactions, those alleged untainted assets are still subject to forfeiture because they are "facilitation property."  Under the criminal drug forfeiture statute, 21 U.S.C. § 853(a)(2), a defendant's property shall be seized if it was used "to facilitate the commission of" drug crimes.  The government urges that any untainted assets that may have been seized were still properly subject to seizure because they

were used to facilitate the Defendants' ongoing conspiracy.  According to the government, any

revenue generated from legitimate prescriptions was invested into the clinics, which were using

those funds to provide illegitimate services.

In a criminal forfeiture setting, facilitation requires that there be a "substantial connection

between the property and the underlying criminal activity."  *U.S. v. Schifferli*, 895 F.2d 987, 989

(4th Cir. 2000) (internal citations omitted).  The property's role in the illegal activity is not

required to be "integral, essential or indispensable."  *Id.* at 990.  Instead, "the term 'facilitate'

implies that the property need only make the prohibited conduct 'less difficult or 'more or less

free from obstruction or hindrance.'"  *Id.* (quoting *U.S. v. Premises known as 3639-2nd St.,*

*N.E.,* 869 F.2d 1093, 1095-97 (8th Cir. 1989)).  *See also U.S. v. Tencer*, 107 F.3d 1120, 1134

(5th Cir. 1997) (stating the same definition of "facilitate").

Appellate courts have upheld criminal forfeitures of untainted assets in a number of cases

under the theory that the assets were used to facilitate ongoing crimes.  In *United States v.*

*Schifferli*, the Fourth Circuit upheld a post-conviction forfeiture of a defendant's office building

and land, although a small percentage of the criminal activity occurred there.  895 F.2d 987, 988-

89 (4th Cir. 1990).  The defendant was a dentist who had been convicted of conspiracy to

illegally distribute and dispense controlled substances under the guise of his medical practice.

*Id.* at 988.  The Fourth Circuit found that the dentist's office was forfeitable property because the

office "provided an air of legitimacy and protection from outside scrutiny" to the defendant's

illicit activities, namely, the writing of false prescriptions.  *Id.* at 991.  *See also U.S. v.*

*McGauley*, 279 F.3d 62, 76 (1st Cir. 2002) (finding forfeiture of an entire account appropriate in

a mail fraud case because the government had shown that the legitimate funds were used to

22

conceal the nature and source of the tainted funds); *U.S. v. Baker*, 227 F.3d 955, 970 (7th Cir.
2000) (finding forfeiture of entire bank accounts appropriate in a money laundering case in
which legal sex businesses were used as fronts for prostitution).  However, the Court notes that,
in *Schifferli*, the seized asset was a building.  Without the building, the defendant could not
perform his illegal activities.  In the present case, the seized assets involved substantial cash.

While the government argues that any untainted cash was used to bankroll or facilitate
Defendants' allegedly illicit activities, the government has not demonstrated how that facilitation
or bankrolling occurred.  Merely placing illegitimate funds in an account with legitimate funds
does not taint the entire account per se.  As the Seventh Circuit has stated, the money itself is the
illicit property, and the account is simply a name, "like the address of a building[.]"  *U.S. v.
$448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992).  To demonstrate that untainted funds are
facilitation property, the government must establish a "substantial connection" between the
untainted funds and the crimes.  *Schifferli*, 895 F.2d at 989.  The government has not made any
specific showing of substantial connection, other than general allegations.

Unlike the dentist's office in *Schifferli*, the small amount of legitimate revenues did not
provide a visible, physical shield or "front" for Defendants' illegal activities.  These small
revenues were intermingled with other funds, and the public and medical community were
unaware of them.  Moreover, the government seized $1.6 million in cash from Ms. Prejean's
home.  The Court does not find a substantial connection between untainted cash stored in a
defendant's private residence and the writing of illicit prescriptions at a business across town.
These funds, if untainted, did not provide the "air of legitimacy" that the dentist's office
provided in *Schifferli*.

Moreover, there is no charge of money laundering here, where one could conceivably argue that untainted funds mixed with tainted funds would facilitate the money laundering scheme.  Here, the charge is conspiracy to improperly prescribe legal drugs.  There is no nexus between the funds received from properly prescribed legal drugs and improperly prescribed legal drugs.  Accordingly, the Court rejects the argument that any untainted funds can be seized in this case as facilitation property.

**D.      Release of Assets**

There are few reported cases in which defendants obtained release of their assets from forfeiture.  Courts that have released assets use one of two methods to determine what assets should be released.  The first method is to identify specific assets that are being held by the government without probable cause.  Once the untainted assets are identified, the district court releases those assets.  *See, e.g., U.S. v. Noreiga*, 746 F. Supp. 1541, 1546 (S.D. Fla. 1990) (stating that specific seized assets would be released to the defendant if the government failed to prove probable cause for seizure).  While this method ensures that the government retains only those assets for which it has probable cause, the method does not ensure that the defendant has adequate funds to pay counsel.

The second method involves a release of assets sufficient to pay counsel and living expenses.  Once the defendant establishes that there are untainted assets and that the assets are needed to pay counsel, the district court releases assets that are sufficient to pay reasonable attorneys' fees.  *U.S. v. Michelle's Lounge*, 39 F.3d 684, 700-01 (7th Cir. 1994); *U.S. v. Moya-Gomez*, 860 F.2d 706, 730-31 (7th Cir. 1988).  In *Michelle's Lounge*, a civil forfeiture case, the district court ordered release of a $15,000 ring to pay attorneys' fees.  39 F.3d at 689.  However,

24

the Seventh Circuit vacated this order and found that, if the defendant was entitled to release of

assets, he was entitled to release of sufficient assets to pay reasonable attorney's fees. *Id.* at 700-

01.  The district court has broad discretion in determining what funds are sufficient and

reasonable to pay a defendant's attorneys and living expenses. *Moya-Gomez*, 860 F.2d at 731.

Nevertheless, it does seem appropriate that the amount released bear some reasonable

relationship to the amount of untainted funds.

       The government argues that no funds should be released from forfeiture.  Alternatively,

the government argues that the district court can only release funds if it finds that the criminal

activity of the defendants is proportionately small compared to the legitimate activity of the

defendants.  However, the government provides the Court with no authority to support this

proposition, other than the cases in which facilitation property was seized.

       Defendants argue that the government has only established probable cause as to 23.057%

of Defendants' assets, and that release of 76.943% of their assets, or $3,695,316, is appropriate.

However, Defendants' figures and argument are based upon a number of questionable

assumptions.  First, Defendants presume that *only* the patients who had multiple files at the

clinics received illegitimate treatment.  It is equally as likely that patients with single files

received treatment outside the usual scope of medical practice.  Second, Defendants presume that

*all* of the patients who had multiple files at the clinics received illegitimate treatment.  It is

unclear whether these multiple files were for two or more clinics during the same treatment

period, making them clearly illegitimate, or rather were files created during different treatment

periods, indicating that a patient changed clinics over time, which could be legitimate.

       Given the absence of controlling precedent on this issue, the Court elects to release

$300,000 of the funds seized by the government.  This amount is reasonably related to the sum of untainted funds, and should be sufficient to enable Defendants to present an adequate defense.

Defendants have demonstrated that Dr. Rosenfeld's patient evaluations were more likely than not within the usual scope of medical practice.  Thus, those evaluations more likely than not generated untainted assets.  Dr. Rosenfeld was employed by the clinics for about four months, or 16 weeks, in 2001.  The government has presented figures estimating the clinics' gross revenue if the clinics had engaged in legitimate patient evaluations of at least five minutes (the figure given by Dr. Rosenfeld).  *See* Government's Post-Hearing Memorandum at 6.[4]  The government asserts that, had the clinics been operating legitimately, their gross revenue in a two-week period in 2005 would have been $176,696.46.  *Id.*

Using this figure, the clinics' gross weekly revenue should have been $88,348.23 (or $176,696.46 / 2), if doctors were evaluating patients in five-minute intervals.  In 2005, when the clinics closed, the clinics employed five doctors.  Thus, the gross weekly revenue per doctor, assuming five-minute evaluations, should have been $17,669.65 (or $88,348.23 / 5).

Assuming Dr. Rosenfeld worked at the clinics for 16 weeks, and that revenues in 2001 were substantially the same as in 2005, the estimated gross revenue generated by Dr. Rosenfeld's evaluations was $282,714.34 (or, $17,669.65 x 16).  Considering the testimony of Ms. Plaisance, the Court finds that there is a likelihood that some patients of the clinics received legitimate treatment from physicians other than Dr. Rosenfeld.  Therefore, the Court concludes that release of $300,000 is reasonable based on the credible evidence presented by Defendants.

---

[4]  Defendants have also presented the Court with evidence of their gross income for the years 2000 to 2004, but this evidence is incomplete.  Defendant's Exhibit 5.  For example, there is no data for the years 2000 to 2003 for the Gretna and Slidell clinics.

The Court reiterates that the government has established probable cause to believe that the majority of the assets seized were traceable to illegal drug transactions.  However, the government has seized virtually all of Defendants' assets under the grand jury's finding that all of Defendants' assets were derived from illegal drug transactions.   The Court finds that such a blanket finding of probable cause is not appropriate, given the evidence presented by Defendants.

The $300,000 to be released is to be used exclusively for attorneys' fees and defense costs.  No funds are to be released for payment of overhead and living expenses.  As the government has stated in previous briefings, Defendants own eleven parcels of real property that are currently under notices of lis pendens.  Lis pendens only places a restraint on alienation of the property; Defendants are free to rent the properties to generate income for living expenses.

## III.  Conclusion

Accordingly, the Defendants' Joint Motion for Release and Exemption of Assets from Forfeiture to Pay Attorneys' Fees, Defense Costs, and Living Expenses should be and hereby is GRANTED IN PART.  IT IS ORDERED THAT the U.S. shall release $300,000 total to Defendants jointly to be used exclusively to pay attorney's fees and defense costs.  Defendants shall make monthly accountings to the Court until resolution of this case to substantiate their expenditures of these funds.

New Orleans, Louisiana, this <u>4th</u> day of August, 2005.

UNITED STATES DISTRICT JUDGE